# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### FORT MYERS DIVISION

MARTHA E. DIXON

        Plaintiff,

vs.                                                              CASE NO: 2:07-cv-319-MMH-SPC

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.

_____

## REPORT AND RECOMMENDATION[1]

_____This matter comes before the Court on the Plaintiff, Martha E. Dixon's Complaint Seeking Review of the Final Decision of the Commissioner of Social Security (Commissioner) denying the Plaintiff's Claim for Disability Insurance (Doc. #1) filed on May 15, 2007.   The Plaintiff filed her Memorandum of Law in Support of the Complaint (Doc. #17) on September 14, 2007.   The Commissioner filed a Memorandum of Law in Support of the Commissioner's Decision (Doc. #18) on October 15, 2007.  Thus, the Motion is now ripe for review.

The Undersigned has reviewed the record, including a transcript of the proceedings before the Administrative Law Judge (ALJ), the exhibits filed and administrative record, and the pleadings and memoranda submitted by the parties in this case.

---

[1]This Report and Recommendation addresses only the issues brought up for review by the District Court pursuant to 28 U.S.C. § 405(g).

## FACTS

### *Procedural History*

On January 24, 2000, the Plaintiff filed an application for Disability Insurance Benefits and Supplemental Security Income payments. (Tr. 85). The application was denied on April 18, 2000. (Tr. 62). A Request for Reconsideration was filed on June 12, 2000. (Tr. 76). The application denial was affirmed on November 27, 2000. (Tr. 66). A Request for Hearing was filed on December 7, 2000. (Tr. 81). A hearing was held on January 11, 2002. (Tr. 34-61). The Plaintiff received an unfavorable decision on February 21, 2002. (Tr. 18-27). A Request for Review of the hearing decision was filed on February 28, 2002. (Tr. 14-16). The Request for Review was denied on February 28, 2003, by the Appeals Council. (Tr. 6-7). A civil action was timely commenced in the United States District Court for the Middle District of Florida, Fort Myers Division. On July 12, 2004, the United States District Court reversed the February 21, 2002, decision and remanded the claim for further consideration of various issues. (Tr. 367-384).

On August 11, 2006, the Administrative Law Judge (ALJ) Dawn Lieb, held a supplemental hearing via video teleconference. (Tr. 355-359). Judge Lieb issued an unfavorable decision on November 9, 2006. (Tr. 343-353). A Request for Review of Judge Lieb's unfavorable decision was timely filed on December 4, 2006. (Tr. 333-335). On December 5, 2006, exceptions were timely filed within 30 days of the ALJ's decision. (Tr. 336- 339). On March 14, 2007, the Appeals Council denied review. (Tr. 330-332). Having exhausted all administrative remedies, the Plaintiff timely filed a Complaint with this Court.

### *Plaintiff's History*

The Plaintiff was born on November 23, 1952, making her forty-five (45) years of age at

2

the date of the most recent decision.  (Tr. 21, 85).  The Plaintiff has a high school education.  (Tr. 21).   The Plaintiff has a past relevant work history as a medical assistant and retail salesperson. (Tr. 21).  The Plaintiff alleges an onset disability date of  May 10, 1998. (Tr. 21).

## *Medical History*

On January 3, 1996, the Plaintiff was admitted to Charter Glade Behavioral Health System (Tr. 211).   The Plaintiff was admitted for acute suicidal ideation, which she later denied. (Tr. 211-212).   The Plaintiff was diagnosed with major depression without psychotic features, somatoform pain disorder and was assessed with a Global Assessment of Functioning (GAF) of 30. (Tr. 211). The Plaintiff  was discharged on January 5, 1996,  because she did not meet the Baker Act criteria and was assessed with a GAF of 40.

On January 21, 1997, the Plaintiff was Baker Acted and diagnosed with major depression, recurrent, and was assigned a GAF of 30. (Tr. 227).  The Plaintiff was released from the Ruth Cooper Center Crisis Stabilization Unit on January 24,  1997,  and was assigned a GAF of 70. (Tr. 221-22).

On April 27,  1998, the Plaintiff was again diagnosed with depression at Family Health Center and was prescribed Zoloft. (Tr.  242). On February 18, 1998, the Plaintiff was diagnosed with depression and back pain. (Tr. 243).  On April 22, 1999, the Plaintiff was diagnosed with depression, anxiety, and hypertension. (Tr. 234). The Plaintiff was given refills for HCTZ and Zoloft. (Tr. 242-243).

On January 14, 1998, the Plaintiff was diagnosed with depression, menopause, and chronic back pain at  Family Health Center. (Tr. 244). On September 18, 1998, the Plaintiff reported to the Family Health Center and complained of frequent urination and rectal bleeding. (Tr. 240). The Plaintiff denied abdominal pain.  (Tr. 240).  On September 28,  1998, the Plaintiff was diagnosed at

3

Family Health Center with dysuria, or painful urination,. (Tr. 238).

On July 15, 1999, the Plaintiff visited Family Health Center. (Tr. 233). On June 13, 2000, the Plaintiff visited Family Health Center for a prescription refill because she was going out of town. (Tr. 228). She was diagnosed with urinary incontinence, menopause, and hypertension. (Tr. 228). On June 23, 2000, the Plaintiff again visited Family Health Center and was diagnosed with urinary incontinence and hypertension. (Tr. 229).

On February 4, 1997, the Plaintiff underwent an MRI of the lumbar spine. (Tr. 165). The MRI showed no evidence of focal lumbar disc herniation or neurocompressive lesion, a marked interval increase in chronic degenerative disc disease at L3-4, now felt to be moderate to marked, as well as stable mild chronic degenerative disc disease at L2-3. (Tr. 165).

On May 15, 2001, the Plaintiff underwent a closed MRI of the lumbar spine. (Tr. 323-24). The MRI revealed a L3-4 disc bulge with a more prominent right posterolateral component unchanged from the prior study and not affecting the exiting right L3 root, and clinical correlation was recommended. (Tr. 324). The MRI also showed mild L2-3, L4-5, and L5-S1 bulge that had not changed from the prior study and a mild facet hypertension including the facet joints at L4-5. (Tr. 324).

From February 23, 1998, through December 8, 1999, the Plaintiff was treated by Dr. Mark E. Jeter. (Tr. 255). On March 16, 1998, Dr. Jeter authored an initial report stating the Plaintiff's prognosis was guarded. (Tr. 255). The Plaintiff furnished him with copies of her MRI reports. (Tr. 255). On December 8, 1999, Dr. Jeter concluded that the treatment the Plaintiff was to receive consisted of specific chiropractic adjustments to restore the loss of biomechanical integrity. (Tr. 254). Dr. Jeter stated the degenerative changes that were revealed on her X-rays are permanent in nature.

However, the goal was to stabilize her spine as much as possible and help prevent it from rapidly degenerating. (Tr. 254).

On March 23, 2000, Kenneth A. Berdick, M.D., completed a physical examination of Plaintiff. (Tr. 261-63). Dr. Berdick noted the Plaintiff fell in June of 1995, sustaining a work-related injury which resulted in the fracture of her right radius and ulnar, head trauma, and the beginning of a chronic low back pain syndrome. (Tr. 261). The Plaintiff underwent open reduction and internal fixation of the right arm with good results and no difficulty with grip strength and finger dexterity. (Tr. 261). Dr. Berdick stated the Plaintiff primarily complained of paralumbar and the sacroiliac areas exacerbated by bending, lifting, and sitting, as well as by changes in the weather. (Tr. 261). They improved by stretching and walking. (Tr. 261). The Plaintiff also took Celebrex and Amitriptyline. (Tr. 261). The Plaintiff stated she could do some housework, some cooking and was able to drive. (Tr. 261). The Plaintiff's grip strength and finger dexterity were normal. (Tr. 263). The Plaintiff stated she had sleep apnea but did not have a sleep study to confirm this as a diagnosis. (Tr. 263). The Plaintiff's hypertension appeared to be well controlled and there was no evidence of end organ damage. (Tr. 263).

The Plaintiff was referred by the State of Florida, Office of Disability Determination to Bruce J. Crowell, Ph.D., who examined her on October 31, 2000. (Tr. 301-03). Dr. Crowell noted the Plaintiff has been treated for depression several times since 1986. (Tr. 303). Dr. Crowell diagnosed the Plaintiff with Major Depression, Recurrent, without Psychotic Features. (Tr. 303).

On May 8, 2001, the Plaintiff saw Mary Beth Saunders, D.O. Dr. Saunders diagnosed the Plaintiff with hypertension, depression, osteoarthritis, back pain with radicular symptoms, and stress incontinence. (Tr. 318). Dr. Saunders stated that Plaintiff was to discontinue Paxil and begin taking

Wellbutrin.  The Plaintiff was given a referral to see Dr. Sangiacomo and Dr. VanBeever.  She was given samples of Detrol LA and Mobic in place of Cerebrex. (Tr. 318).

On December 28, 2001, the Plaintiff saw Howard Imanuel, DPM.  Dr. Imanuel opined the Plaintiff had lesser metatarsalgia with probable interdigital neuromas bilaterally and has recurrent hallux abductus and bunion deformities with a hallux limitus contidion noted bilaterally. (Tr. 327). Dr. Imanuel also stated that he discussed ingrown nail surgery for the Plaintifl's painful left hallux ingrown nail. (Tr. 327).

On January 9, 2002, the Plaintiff returned to Dr. Imanuel and further discussed foot surgery. (Tr. 328).   Dr. Imanuel found the Plaintiff has metatarsalgia and a neuroma in the 3rd Interspace. The Plaintiff suffered cramping and diminished sensation.  A Mulder's click was present. (Tr. 328). Dr. Imanuel discussed treatment options which included a joint arthroplasty with implant. (Tr. 328).

From July 16, 2003, through July 14, 2004, the Plaintiff was treated by Dr. Abdul Aziz. (Tr. 493-503).   On July 16, 2003, the Plaintiff stated she had pain in her knees, back, and feet, suffers constipation, blood in her stools, heartburn, and abdominal bloating. (Tr. 493).   Dr. Aziz ordered x-rays of the painful areas. (Tr. 493).   On July 21, 2003, Dr. Aziz discussed the lab results with the Plaintiff which showed she had slightly elevated C4 complement levels and her abnormal anti-nuclear antibody (ANA) was positive. (TI. 496).   The Plaintiff was prescribed Vioxx. Dr. Aziz stated plantar spurs were noted on her x-ray results, which may require a podiatrist. (Tr. 497).

On September 18, 2003, the Plaintiff presented to Dr. Aziz and was placed on hydroxychroroquine.  (Tr. 498-499).   The Plaintiff was found to have good range of motion in the shoulders, elbows, hips, and knees.  (Tr. 498).   In considering fibromyalgia, the Plaintiff had just 12/18 tender points.  (Tr. 498).   Examination of the spine did not reveal any point tenderness over

the spine.  (Tr. 498).

On December 31, 2003, the Plaintiff returned to Dr. Aziz and was  diagnosed ANA positive and will continue taking hydroxy chloroquine.  The Plaintiff was also diagnosed with DJD and fibromyalgia.  She was given Ultrain and was to continue taking Trazodone.  The Plaintiff had myalgias[2] and elevated creatine phosphokinase (CPK) level, and  was prone to easy bruising. (Tr. 501).

On July  14, 2004, the Plaintiff was assessed as a ANA positive with DJD. (Tr. 503).  The Plaintiff was still taking the hydroxy chloroquine, which she indicated was helping a lot with her sense of fatigue. (Tr. 502).   The Plaintiff was to have repeat lab work to see if there had been any changes in her serology.  (Tr. 503).  The Plaintiff was to be prescribed stronger pain medication.  (Tr. 503).

From July 30,  2003, through July 20,  2006, the Plaintiff was treated by Dr. Nancy M. Troast.  (Tr. 396-403, 463-474).  On July 30, 2003, Dr. Troast diagnosed the Plaintiff with polyarthralgia, question etiology, hypertension, and grief reaction. (Tr. 474).  The Plaintiff was treated with anti-inflammatory medication, was prescribed Naprosyn, and continued Prilosec and Verapamil.  (Tr. 474).

On October 2, 2003, the Plaintiff was diagnosed with abnormal ANA, hypertension, anxiety, depression, fibrocystic breast disease, and insomnia. (Tr. 403).  On June 30, 2004,  Dr. Troast referred Plaintiff to rheumatologist, Dr. Burstillo. (Tr. 402).  On January 19, 2004, the Plaintiff was diagnosed with polyarthralgia with positive ANA, hypertension, hypercholosterolemia, and anxiety/depression. (Tr. 472).  On August 23,  2004,  the Plaintiff was diagnosed with lower back

---

[2]Myalgia is defined as tenderness or pain in the muscles; muscular rheumatism.  *Taber's Cyclopedic Medical Dictionary*, 1341 (Donald Menes, M.D. ed., 19th ed. F.A. Davis 1997)(hereinafter *Taber's*)

pain with sensory deficit, depression, polyarthralgia, and fatigue. (Tr. 401).

On December 3, 2004, the Plaintiff was diagnosed with a left breast cyst, chronic back pain, hypercholesterolemia, depression, and positive ANA. (Tr. 399). Dr. Troast recommended that the Plaintiff see a new rheumatologist, Dr. Bustillo, and may need an MRI. (Tr. 399). The Plaintiff was given Wellbutrin samples for her depression. (Tr. 399).

On August 12, 2005, the Plaintiff was diagnosed with hypertension, hypercholesterolemia, depression, anxiety, polyarthralgia with a positive ANA, insomnia, and an abnormal lab. (Tr. 397). On February 22, 2006, the Plaintiff was diagnosed with upper respiratory infection (URI), bronchitis, pharyngitis, cough, cystitis, and dysuria (Tr. 468).

On July 20, 2006, the Plaintiff was diagnosed with depression, anxiety, and resolving maxillary sinusitis. (Tr. 464). Dr. Troast ordered the Plaintiff to stop using Lexapro and begin using Paxil, continue Wellbutrin XL, continue Alavert p.m., and all bodily pain and lipid medications. (Tr. 464). Dr. Troast ordered the Plaintiff to see Dr. Bustillo regarding her Plaquenil and suspicions for lupus. (Tr. 464). Dr. Troast referred the Plaintiff to a psychiatrist, Dr. Saugiacomo. (Tr. 464).

From January 5, 2005 to May 11, 2005, the Plaintiff was treated by Dr. Christina Diaz. (Tr. 412-427). On January 5, 2005, Dr. Diaz noted that the Plaintiff tired easily, gained weight, had blurred vision, hearing loss, bleeding gums, coughs, shortness of breath, chest pain, blood in the stool, chronic constipation, frequent heartburn, incontinence, urinates frequently, changes in personality, depression, increased nervousness, insomnia, increased stress, DJD, back pain, muscular pain, muscular weakness, lump in breast, loss of hair, excessive thirst, excessive sweat, hot flashes, anemia, bruises easily, and problems with immunity. (Tr. 426 ).

On March 9, 2005, Dr. Diaz noted the Plaintiff had lumbar disc degeneration and numbness,

back pain, and set up physical therapy. (Tr. 421-422). On March 28, 2005,  April 4, 2005,  April 6, 2005, and April 11, 2005, the Plaintiff was treated by Dr. Diaz for physical therapy. (Tr. 436- 440).

On May 11, 2005, the Plaintiff was evaluated by Dr. Diaz.  (Tr. 415-417).  Dr. Diaz opined the  Plaintiff suffered from back pain.  (Tr. 415-417).  There appeared to be bone, joint and some muscle pain.  (Tr. 415-417).

On August 17, 2005, the Plaintiff was evaluated by Dr. Diaz and diagnosed with lumbar disc degeneration, numbness and complaints of midline back pain and was prescribed Robaxin. (Tr. 412-414).

On June 24, 2005, the Plaintiff was treated by Dr. Juan Bustillo who completed a Fibromyalgia/Myofascial Pain Residual Functional Capacity Questionnaire. (Tr. 448).  Dr. Bustillo indicated the Plaintiff was diagnosed with chronic back pain and possible connective tissue disease. (Tr. 448).  Dr. Bustillo indicated the Plaintiff often experienced symptoms severe enough to interfere with attention and detail.  (Tr. 448).  Dr. Bustillo indicated the Plaintiff has a marked limitation in the ability to deal with work stress..  Dr. Bustillo listed the medication and side effects to include Trazedone -sedation, anxiety, Wellbutrin - anxiety, psychosis, and Robaxin - sedation. (Tr. 448).  Dr. Bustillo indicated the Plaintiff can only continuously sit and stand for 15 minutes and can sit and stand/walk less than 2 hours in an 8 hour day. Dr. Bustillo stated the Plaintiffs leg should be elevated 6-8".  (Tr. 448).  Dr. Bustillo opined the Plaintiff can frequently lift less than 10 lbs., can occasionally lift 10 lbs., and can never lift 20 lbs. or more.  (Tr. 448). Dr. Bustillo indicated the Plaintiff has significant limitations regarding  handling or fingering.  (Tr. 448).  On September 20, 2005, the Plaintiff was again treated by Dr. Bustillo and was diagnosed with systemic lupus erythematuosus with secondary fibromyalgia syndrome. (Tr, 514).

On September 8, 2005, the Plaintiff was treated by Dr. Cecilio Pizarro. (Tr.454-459). Dr. Pizarro stated the Plaintiff suffered from major depression recurrent severe. (Tr. 459). The Plaintiff had a GAF score of 50, with a high score of 60 in the past year. (Tr. 459).

From February 9, 1999, through October 20, 2005, the Plaintiff was treated by Dr. Michael Bays. (Tr. 532-574). On February 9, 1999, Dr. Bays diagnosed Plaintiff with bright red rectal bleeding, hypertension, osteoarthritis, and chronic back pain. (Tr. 533). On February 13, 1999,  Dr. Bays performed a colonoscopy on the Plaintiff and found hemorrhoidal disease of grade 11. (Tr. 536).

On September 15, 2005, Dr. Bays diagnosed the Plaintiff with gastroesophageal reflux disease, elevated liver function test, hyperlipidemia, fibromyalgia, chronic back pain, depression,  and hypertension. (Tr. 555).  Dr. Bays scheduled an upper endoscopy and colonoscopy. (Tr. 555).

On September 29, 2005, the Plaintiff was diagnosed with gastritis, five colonic polyps, and tortuous colon. (Tr. 571-572).  Dr. Bays stated that the Plaintiff may have been suffering from irritable  bowel syndrome and infectious colitis, but was  recovering. (Tr. 572).

On October 20, 2005, the Plaintiff was diagnosed with five fundal polyps which were removed, gastritis without evidence for helicobacter pylori (H pylori), and tortuous colon secondary to adhesions. (Tr. 573).

On July 10, 2006, the Plaintiff was treated by Dr. Jeremy Schwartz. (Tr. 578).  Dr. Schwartz diagnosed Plaintiff with right  hallux vagus and left, first metatarsophalangeal (MTM)  osteoarthritis, second and third hammertoes with previous silastic implant. (Tr. 578). Upon examination, the Plaintiff's left foot has significant deformity and pain. (Tr. 578). Dr. Schwartz stated the Plaintiff would require bone grafting. (Tr. 578).

*Administrative Law Judge's Decision*

Upon consideration of the record, the ALJ found the Plaintiff met the disability insured status requirements of the Act on May 10, 1998, the onset date of disability, and continued to meet them only through September 30, 2001. (Tr. 26). The ALJ found the Plaintiff has not engaged in substantial gainful activity since the alleged onset date of disability, May 10, 1998. (Tr. 26). The ALJ found the Plaintiff has chronic back pain and hypertension, a combination of impairments considered "severe" based on the requirements in the Regulations. (Tr. 26). The ALJ further found the Plaintiff's medically determinable impairments do not meet or medically equal one of the listed impairments on Appendix 1, Subpart P, Regulations No. 4. (Tr. 26). The ALJ, having carefully considered all of the medical opinions in the record regarding the severity of the Plaintiff's impairments, determined the Plaintiff has the residual functional capacity (RFC) for a wide range of medium work. (Tr. 26). The ALJ concluded the Plaintiff was able to return to her past relevant work, as she described, and that her past relevant work does not required the performance of work related activities precluded by her RFC. (Tr. 26). Therefore, the ALJ concluded that the Plaintiff was not under a "disability", as defined in the Social Security Act, at any time through the date of the decision. (Tr. 26).

## THE STANDARD OF REVIEW

### A. Affirmance

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards, McRoberts v. Bowen, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the findings are supported by substantial evidence, Richardson v. Perales, 402 U.S. 389, 390, 91 S. Ct. 1420, 28 L. Ed 2d 842 (1971). In evaluating whether a claimant is disabled, the ALJ must follow the

sequential inquiry described in the regulations[3].  <u>See</u> 20 C.F.R. §§ 404.1520(a), 404.920(a).  The

Commissioner's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. §

405(g).  Substantial evidence is more than a scintilla-*i.e.*, the evidence must do more than merely

create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable

person would accept as adequate to support the conclusion.  <u>Foote v. Chater</u>, 67 F.3d 1553, 1560

(11th Cir. 1995) (citing <u>Walden v. Schweiker</u>, 672 F.2d 835, 838 (11th Cir. 1982)); <u>Richardson</u>, 402

U.S. at 401.

 Where the Commissioner's decision is supported by substantial evidence, the District Court

will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the

reviewer finds that the evidence preponderates against the Commissioner's decision.  <u>Edwards v.</u>

<u>Sullivan</u>, 937 F.2d 580, 585 n.3 (11th Cir. 1991); <u>Barnes v. Sullivan</u>, 932 F.3d 1356, 1458 (11th Cir.

1991).  The District Court must view the evidence as a whole, taking into account evidence favorable

as well as unfavorable to the decision.  <u>Foote</u>, 67 F.3d at 1560; <u>Lowery v. Sullivan</u>, 979 F.2d 835,

---

[3]The inquiry requires the ALJ to engage in a five-step analysis, which will either preclude or mandate a finding of disability.  The steps are as follows:
 *Step 1.*  Is the claimant engaged in substantial gainful activity?  If the claimant is engaged in such activity, then he or she is not disabled.  If not, then the ALJ must move on to the next question.
 *Step 2.*  Does the claimant suffer from a severe impairment?  If not, then the claimant is not disabled.  If there is a severe impairment, the ALJ moves on to step three.
 *Step 3.*  Does the claimant's impairment meet or equal one of the listed impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1.  If so, then the claimant is disabled.  If not, the next question must be resolved.
 *Step 4.*  Can the claimant perform his or her former work?  If the claimant can perform his or her past relevant work, he or she is not disabled.  If not, the ALJ must answer the last question.
 *Step 5.*  Can he or she engage in other work of the sort found in the national economy?  If so, then the claimant is not disabled.  If the claimant cannot engage in other work, then he or she is disabled.  <u>See</u> 20 C.F.R. §§404.1520(a)-(f), 416.920(a)-(f); see also <u>Phillips v. Barnhart</u>, 357 F.3d 1232, 1237-40 (11th Cir. 2004); <u>Foote v. Chater</u>, 67 F.3d 1553, 1557 (11th Cir. 1995) (per curiam).

837 (11th Cir 1992) (holding the court must scrutinize the entire record to determine reasonableness of factual findings).

The court "may not decide the facts anew, reweigh the evidence or substitute it's judgment for that of the [Commissioner]."Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983).  If the Commissioner's decision is supported by substantial evidence, it should not be disturbed. Lewis v. Callahan, 125 F. 3d 1436, 1440 (11th Cir. 1997).

### B.  Reversal and Remand

Congress has empowered the district court to reverse the decision of the Commissioner without remanding the cause. 42 U.S.C. § 405 (g)(Sentence Four). The district court will reverse a Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law. Keeton v. Department of Health and Human Services, 21 F.3d 1064, 1066 (11th Cir. 1994); Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991); Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990). This Court may reverse the decision of the Commissioner, and order an award of disability benefits, where the Commissioner has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt. Davis v. Shalala, 985 F.2d 528, 534 (11th Cir. 1993).  The district court may also remand a case to the Commissioner for a rehearing under sentence four of 42 U.S.C. § 405 (g); under sentence six of 42 U.S.C. § 405 (g); or under both sentences. Jackson v. Chater, 99 F.3d 1086, 1089 - 92, 1095, 1098 (11th Cir. 1996).

To remand under sentence four, the district court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the

law relevant to the disability claim. Jackson, 99 F.3d at 1090 - 91 (remand appropriate where ALJ failed to develop a full and fair record of claimant's residual functional capacity); Davis, 985 F.2d at 534 (remand to the Secretary is warranted where the ALJ has failed to apply the correct legal standards).   Where the district court cannot discern the basis for the Commissioner's decision, a sentence-four remand may be appropriate to allow the Commissioner to explain the basis for his decision. Falcon v. Heckler, 732 F.2d 827, 830 (11th Cir. 1984). (remand was appropriate to allow ALJ to explain the his basis of his decision).

On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence upon a showing that there is new evidence which is material and that there was good cause for the failure to incorporate such evidence into the record during a prior proceeding. Diorio v. Heckler, 721 F.2d 726, 729 (11th Cir. 1983)(finding ALJ error and remanding to consider psychiatric evaluation); Reeves v. Heckler, 734 F.2d 519, 522 n.1 (11th Cir. 1984) (remanding on the grounds that it is reversible error for the ALJ not to order a consultative examination when warranted). After a sentence-four remand, the district court enters a final and appealable judgment immediately, and then loses jurisdiction. Jackson, 99 F.3d at1095.

In contrast, a sentence-six remand may be warranted even in the absence of an error by the Commissioner if new, material evidence becomes available to the claimant. Jackson, 99 F.3d at 1095. Sentence six of § 405 (g) provides:

> The court . . . may at any time order additional evidence to  be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.

42 U.S.C. § 405 (g) (sentence six). To remand under sentence six, the claimant must establish: 1.)

that there is new, non-cumulative evidence; 2.) that the evidence is material — relevant and probative

so that there is a reasonable possibility that it would change the administrative result; and 3.) there

is good cause for failure to submit the evidence at the administrative level.  Jackson, 99 F.3d at 1090 -

92; Keeton v. Dept. of Health and Human Serv., 21 F.3d 1064, 1068 (11th Cir. 1994).   With a

sentence-six remand, the parties must return to the district court after remand to file modified findings

of fact. Jackson, 99 F.3d at 1095. The district court retains jurisdiction pending remand, and does not

enter a final judgment until after the completion of remand proceedings.[4] Id.

   C.   **Standard of Review for Evidence Evaluated by the Appeals Council**

Congress left the term "final decision" undefined in 42 U.S.C. § 405 (g). Where a claimant

exhausts his administrative remedies by requesting review by the Appeals Council and the Appeals

Council then denies review, the Appeals Council's order denying review is a "final decision" of the

Commissioner under § 405 (g). Sims v. Apfel, 530 U.S. 103, 106-107, 120 S.Ct. 2080, 147 L. Ed.

2d 80 (2000); Bloodsworth, 703 F.2d at 1239.   The Appeals Council "will" review a case if there

appears to be an abuse of discretion by the ALJ, if there is an error of law, or if the ALJ's action,

findings, or conclusions are not supported by substantial evidence. 20 C.F.R. § 416.1470; Sims, 530

U.S. at 111; Parker v. Bowen, 788 F.2d 1512, 1518 (11th Cir. 1986) (en banc). The Appeals

Council's denial of review is subject to judicial review to determine if it is supported by substantial

evidence. Sims, 530 U.S. at 111.

---

   [4]The time for filing an application for attorneys fees under the Equal
Access to Justice Act, 28 U.S.C. § 2412 ["EAJA"] differs in remands under
sentence four and sentence six. Jackson, 99 F.3d at 1089, 1095 n.4 and
surrounding text. In a sentence-four remand, the EAJA application must be filed
after the entry of judgment before the district court loses jurisdiction. Id. In
a sentence-six remand, the time runs from the post-remand entry-of-judgment date
in the district court. Id.

## THE LAW

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416 (I), 423 (d)(1); 20 C.F.R. § 404.1505. The impairment must be severe, making the claimant unable to do his or her previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423 (d)(2); 20 C.F.R. §§404.1505 - 404.1511.

## DISCUSSION

### *Whether the ALJ Properly Considered the Plaintiff's Impairments in Combination*

The Plaintiff argues the ALJ erred by not properly considering the Plaintiff's impairments in combination. Specifically, the Plaintiff argues the ALJ did not appropriately consider the Plaintiff's impairments of urinary incontinence, back pain, and depression. The Defendant maintains the ALJ adequately considered the combined effects of the Plaintiff's impairments and articulated them in the decision. Thus, the ALJ's decision was based upon substantial evidence.

At the second step in the evaluation process, the ALJ is to "consider the medical severity of the [Plaintiff's] impairments. 20 C.F.R. § 404.1520(a)(4)(ii). When considering the severity of the claimant's medical impairments, the ALJ must determine whether the impairments, alone or in combination "significantly limit" the claimant's "physical or mental ability to do basic work skills." Phillips v Barnhart, 357 F.3d 1232, 1237 (11th Cir. 2004) (citing C.F.R. § 404.1520(c)). At the second step, the Plaintiff bears the burden of proof that he suffers from a severe impairment or combination of impairments. Gibbs v. Barnhart, 156 Fed. Appx. 243, 246 (11th Cir. 2005). An impairment or combination of impairments is not severe if it "does not significantly limit [the

plaintiff's] physical or mental ability to do basic work activities," including: (1) "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; (2) "[c]apacities for seeing, hearing, and speaking;" (3) "[u]nderstanding, carrying out, and remembering simple instructions;" (4) "[u]se of judgment;" (5) "[r]esponding appropriately to supervision, co-workers and usual work situations;" and (6) "[d]ealing with changes in a routine work setting." Id. (citing 20 C.F.R. § 404.1521(a),(b)). Where a claimant has alleged several impairments, the Commissioner has a duty to consider the impairments in combination and to determine whether the combined impairments render the claimant disabled. Jones v. Department of Health and Human Services, 941 F.2d 1529, 1533 (11th Cir. 1991).

An ALJ properly considers the Plaintiff's impairments in combination if he states that the Plaintiff does not have an impairment, or combination of impairments of sufficient severity to prevent him for engaging in any substantial gainful activity. Gibbs, 156 Fed. Appx. at 246 (citing Wheeler v Heckler, 784 F.2d 1073, 1076 (11th Cir. 1986)).  Here, the ALJ specifically stated the following:

> Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

The ALJ was clear in her statement as to having considered the Plaintiff's impairments.  Furthermore, contrary to the Plaintiff's argument, the ALJ thoroughly discussed the Plaintiff's impairments of urinary incontinence, back pain, and depression.

The Court notes this case was previously remanded pursuant to sentence four of 42 U.S.C. §§405(g) for further consideration of the Plaintiff's allegation of urinary incontinence.  The Plaintiff's sole argument is that the ALJ did not properly consider the Plaintiff's impairments in combination and their effect on her ability to participate in substantial gainful work activity.  Contrary to the Plaintiff's assertion, however, the ALJ  considered the Plaintiff's allegation of urinary incontinence, including

17

the Plaintiff's testimony and objective medical evidence.   In her decision,   the ALJ provided considerable reasoning regarding the Plaintiff's complaints of urinary incontinence.   She states:

> ...over the course of the three some years at issue in this case, the claimant's complaints of urinary incontinence were limited.  On one occasion, when the claimant was specifically referred to another specialist, she did not go. Moreover, there is nothing in the record with regard to objective abnormalities related to urinary incontinence beyond general references in the claimant's medical history. A renal scan done in August 2001, was normal. Specific references in the record to urinary function include a note dated August 4, 1997, indicating that the claimant did not exhibit "focal weakness, bowel or bladder sphincter dysfunction (Exhibit 6F/17). On June 13, 2000, the records from Family Health Centers of SW Florida indicate that the physician's assessment included "urinary incontinence" and his plan included a consult for urinary incontinence with Dr. Droulisa. A similar notation is found in the record of June 13,2000.  On August 10, 2000, Dr. Mary Beth Saunders indicated that the [Plaintiff] denied dysuria or urgency but noted that she had "some incontinence." Dr. Saunders did not make any further evaluation or comment. Dr. Berdick also made a reference to a history of urinary incontinence on March 23, 2000,  but did not address it in his findings or assessment.  At the hearing, the claimant testified that in 1994, she underwent a surgical procedure on her bladder in conjunction with a hysterectomy and it was her testimony that this did not result in any improvement in her symptoms. In fact, she testified that she remained incontinent all the time from 1998 to 2001.  This is in contrast to the 1997 note referenced above. On May 8, 2001, Dr. Saunders which indicated that the claimant complained of "increased urinary incontinence and loss of control when she coughs or sneezes." Dr. Saunders' impression was that of "stress incontinence" but he gave her a referral to see Dr. VanBeever who had evaluated her in the past.  When questioned at the hearing, the claimant indicated that she did not follow up with Dr. VanBeever nor did she take medication that was prescribed to improve her urinary symptoms. There are no other references to urinary incontinence in the medical records until July 16,  2003, when Dr. Aziz indicated that "she has had problems with incontinence" without addressing it in his plan. In fact, Dr. Aziz continued to treat the claimant throughout 2003 and 2004, without another reference to urinary symptoms (Exhibit 30F). Similarly, the record contains a note from Dr. Bays dated October 20, 2005,  which indicates that there is "no frequent or painful urination" (Exhibit 32F/46). While these records post date the period at issue, they are relevant to a longitudinal view of the claimant's allegations that she was incontinent all the time from 1994 onward and that this incontinence was disabling. In fact, the records make it clear that other than an occasional reference to a history of incontinence, the claimant's physicians did not appear to view this complaint as important enough to address in their plans for treatment. The lack of more than passing references to a history of urinary symptoms without workup or specification in the medical records also appears to contradict the

claimant's statements that her incontinence was constant and disabling.  In light of the above, the undersigned find that the claimant's ...complaints of urinary incontinence are not considered to be "severe" under the regulations (Exhibits 6F, 9F, 10F. 1 IF, 13F, 17F and 21F).  (Tr. 347-348).

It is evident that the ALJ properly considered the medical evidence with regard to the Plaintiff's complaint of urinary incontinence and discussed her reasoning  in great detail.  The ALJ referred to the opinions of several physicians and objective diagnostic tests that did not support a claim of a disabling impairment. The Plaintiff's testimony regarding consistent incontinence was discounted because treatment notes were contradictory to her claims.  The ALJ went even further and considered medical records that were outside of the relevant time period but found they had bearing on the Plaintiff's allegations as a whole.  Clearly, the ALJ did not err in her consideration of the Plaintiff's urinary incontinence.

The ALJ notes the Plaintiff's history of low back pain.  (Tr. 346).  As stated by the ALJ, diagnostic tests showed disc space narrowing at L2-L3 and L3-L4, with mild disc bulging. (Tr. 346). The Plaintiff complained of chronic back pain but was treated with medications.  (Tr. 348). Diagnostic scans of the lower extremities revealed normal results. (Tr. 347).  Further, treatment for the back pain remained conservative. (Tr. 347).  Clearly, the evidence did not support the Plaintiff's allegations of disabling pain.

Regarding the Plaintiff's allegation of depression, the ALJ acknowledged the existence of mental health impairments,   However, upon consideration of the evidence, the ALJ determined that although severe impairments existed, they were not to the severity alleged by the Plaintiff.  (Tr. 348). The ALJ noted the Plaintiff was admitted to Charter Glade Behavorial Health Hospital because she admitted to suicidal ideation.  (Tr. 348). Upon admission, the Plaintiff denied having suicidal ideation

and was noted to be "somewhat dramatic" and "embellishing her symptoms". (Tr. 212, 348). She was discharged after a brief stay. (Tr. 212, 348). One year later, the Plaintiff was admitted again but like the first incident, she was discharged after a brief and uneventful stay. (Tr. 348). Her mood improved and her GAF was 70, which indicates only mild symptoms, (Tr. 348) Moreover, in further support of her finding, the ALJ points to the opinions of the two consultative examiners. (Tr. 348). Both physicians made similar findings in that the Plaintiff was calm, cooperative with good hygiene and grooming, and was fully oriented. (Tr. 259-260, 301-303, 348). The Plaintiff was anxious and her mood was, at most, mildly depressed. (Tr. 260, 348). As illustrated by the ALJ, there is insufficient evidence to support a claim of severe limitations as a result of depression.

The Regulations are clear that a determination on the issue of medical equivalence to a listed impairment must be based upon medical findings. 20 C.F.R. § 404.1526(a). When a Plaintiff claims to have a condition that meets or equals a Listing, the Plaintiff bears the burden of proof that she suffers from a severe impairment or combination of impairments. Gibbs v. Barnhart, 156 Fed. Appx. 243, 246 (11th Cir. 2005). The Regulations are clear that a determination on the issue of medical equivalence to a listed impairment must be based upon medical findings. 20 C.F.R. § 404.1526(a). To meet a Listing, a plaintiff must have a diagnosis included in the Listings and must provide medical reports documenting the conditions meet the specific criteria of the Listing. Johnson v. Barhhart, 148 Fed. Appx. 838, 840 (11th Cir. 2005). To equal a Listing, the medical findings must be "at least equal in severity and duration to the listed findings." Wilson v. Barnhart, 284 F.3d 1219, 1224 (11th Cir. 2002) (citing 20 C.F.R. § 404.1526(a)).

Here, the Plaintiff failed to meet her burden of proof that her combination of impairments were disabling. The ALJ clearly acknowledged the complaints put forth by the Plaintiff. However,

the medical record did not support the claims of severe impairments as alleged by the Plaintiff. Furthermore, the ALJ provided a thorough explanation as to her reasoning. Where the Commissioner's decision is supported by substantial evidence, the District Court will affirm. Edwards, 937 F.2d at 585 n.3.

Accordingly it is hereby

**RESPECTFULLY RECOMMENDED:**

The Decision of the Commissioner should be **AFFIRMED.**

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal**.**

**RESPECTFULLY RECOMMENDED** at Fort Myers, Florida, this 1st day of August, 2008.

SHERI POLSTER CHAPPELL
UNITED STATES MAGISTRATE JUDGE

Copies:  Counsel of record

21